## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Erine Libby

     v.                              Case No. 20-cv-936-JL

Kiloko Kijakazi,
Commissioner of Social Security

### REPORT AND RECOMMENDATION

Pro se plaintiff Erine Libby, appearing in forma pauperis, brings this action under 42 U.S.C. §§ 405(g), seeking judicial review of the denial of her claim for Social Security disability benefits. Although the Administrative Law Judge ("ALJ") concluded that plaintiff's asthma was a severe impairment that kept her from returning to her previous job as a nurse, the ALJ found that plaintiff was not disabled because she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy after the alleged onset date of her disability. Plaintiff contends that the "ALJ" improperly weighed medical evidence in evaluating her claimed impairments and residual functional capacity. The Commissioner, in turn, moves for an order affirming the ALJ's decision. The matter is before the court for preliminary review. See 28 U.S.C. § 1915(e)(2); LR 4.3(d)(2). Finding no reversible error, the court recommends that the district judge deny Libby's motion and grant the Commissioner's motion.

## I. STANDARD OF REVIEW

The court is authorized to review the parties' submissions and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. See 42 U.S.C. § 405(g). That review is limited, however, "to determining whether the [Commissioner] used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). The court defers to the Commissioner's findings of fact, so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (cleaned up). This "extremely deferential" standard, Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (O'Connor, J., dissenting), is "notoriously difficult to

overcome." Pan Am Railways, Inc. v. United States Dep't of Labor, 855 F.3d 29, 36 (1st Cir. 2017).

If the Commissioner's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. The Commissioner's findings are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (internal quotation marks and brackets omitted).

## **II. BACKGROUND**

A. Procedural History

Plaintiff is 40 years old and previously worked as a critical care nurse. She filed an application for disability insurance benefits in October 2016, alleging disability beginning on November 9, 2015. Plaintiff's claim was denied and an administrative hearing was held in April 2018. The ALJ issued a decision in April 2018, finding that Plaintiff was not disabled. Admin. Rec. ("AR") at 170–88.

Plaintiff challenged that decision, and the Appeals Council granted her request for review, vacating the April 2018 decision and remanding her claim for a new hearing. Id. at 190-93. On remand, new hearings were held in May 2019 and September 2019. Id. at 49-80, 90- 111.  The ALJ issued a new decision in November 2019, again finding that plaintiff is not disabled. Id. at 13-39. The Appeals Council later denied Plaintiff's request for review. Id. at 1-7), rendering the ALJ's decision final. Plaintiff then filed this action.

B. Relevant Medical History[1]

Plaintiff was 34 years old in November 2015, when she alleges she could no longer work as a critical care nurse, initially because of breathing problems caused by asthma and later because of fatigue and dizziness, which plaintiff attributed to both systemic exertion intolerance disease (SEID) and the hypermobility type of Ehler's Danlos Syndrome (EDS).

On October 19, 2015, plaintiff was evaluated by Francis McDermott, M.D., for an exacerbation of asthma. Id. at 838. At that time, she was still occasionally smoking but less than she had been. Id. On exam, she had normal breath sounds, no respiratory distress, no wheezes, and no rales. Id. at 840. Dr.

---

[1]The court here provides a summary of the relevant facts. A more detailed recitation appears in the Acting Commissioner's statements of material facts (Doc. No. 17), which the court incorporates by reference. See L.R. 9.1(b)-(c).

McDermott wrote that plaintiff's "lungs actually sound quite good" and "she is improving in her exercise tolerance," but "is not yet ready to return to work." Id. at 843).

When plaintiff next saw Dr. McDermott on November 30, 2015, she was not feeling better after a second course of prednisone, as she still had complaints of dyspnea on exertion. Id. at 846. Dr. McDermott noted that, "unfortunately[,] [plaintiff] continues to smoke although much less than previous." Id. Plaintiff's examination was normal. Id. at 848. Dr. McDermott was "less convinced that this is asthma given the fact that she is still quite symptomatic and had not noticed her usual improvement with her course of prednisone." Id. at 851. He ordered a chest x-ray and an echocardiogram "to look for evidence of anemia or other abnormality although [he did] not think that that [was] likely to be the case." Id. Plaintiff's chest x-ray was unremarkable and her labs were "reassuring." Id. Dr. McDermott urged plaintiff to quit smoking. Id. at 852.

On December 21, 2015, plaintiff was first treated by Glenn S. Newsome, M.D. Id. at 668. Although plaintiff reported having had asthma for her entire life, she became ill in November 2015 with fatigue and chills, and a deterioration in her breathing. Id. She told Dr. Newsome that she felt breathless and dizzy performing relatively simple tasks and also experienced right-sided chest pain. Id. Plaintiff's examination was normal,

including clear lungs and breath sounds. Id. at 669). Dr. Newsome noted plaintiff's "very strong history of asthma," but that "this presentation seems to be more." Id.  In addition to increasing plaintiff's asthma medication, Dr. Newsome suggested that she see Dr. Harrison Farber, a pulmonologist. Id.

Plaintiff saw Dr. Farber, M.D. on February 11, 2016. AR at 582. She reported shortness of breath since November 2015, and said she was doing much less and had gained 40 pounds since July 2015. Id. Dr. Farber noted that a November 2015 echocardiogram was normal, as was a chest x-ray, and bloodwork (apart from a hepatitis B positive result). Id. On exam, he found no signs of pulmonary hypertension. Id. at 583. His impression was that plaintiff's shortness of breath was likely related to asthma and weight gain; however, he noted that it was important to rule out pulmonary hypertension because she had a history of deep vein thrombosis and an underlying liver disease. Id. He recommended pulmonary artery catheterization for further evaluation. Id.

On February 18, 2016, Plaintiff told Dr. Newsome that Dr. Farber "feels there is a high likelihood of primary pulmonary hypertension." Id. at 666. Plaintiff reported that she could not walk more than a half block and spent most of her day in bed. Id. At the same time, she indicated that her asthma was under control with no wheezing or cough. Id. Plaintiff was still an occasional smoker. Id. Her examination was normal. Id. at 667.

On March 9, 2016, Dr. Farber performed a pulmonary artery catheterization for suspected pulmonary hypertension. AR at 568. The results were normal and Dr. Farber concluded that Plaintiff's "[s]ymptoms [were] likely due to recent weight gain." Id. On May 5, 2016, Plaintiff saw Dr. Newsome for follow-up. Id. at 664. She described instances of right-sided chest pain at rest, and said she was trying to remain as active as possible, but walking, carrying objects, and climbing stairs was difficult because of shortness of breath. Id. Plaintiff's examination was normal, including clear breath sounds. Id. Dr. Newsome wrote that he "would feel better if [Plaintiff] had an official opinion from a center that specializes in pulmonary hypertension." Id.

Pulmonary function testing from May 13, 2016, showed a moderate obstructive lung defect, with "a good response to bronchodilator." AR at 648–49. Imaging of Plaintiff's lungs was negative for significant pulmonary effusion. Id. at 652. On June 2, 2016, Dr. Newsome noted plaintiff's two studies since her last visit. Id. at 662. Plaintiff reported the same level of shortness of breath, "although she is doing more" including participating in a friend's wedding. Id. Plaintiff's examination was otherwise normal. Id. Dr. Newsome wrote that he wanted a second opinion about Plaintiff shortness of breath, indicating that Plaintiff's asthma and weight did not seem to be the root

cause and that she might need to have an in-depth
cardiopulmonary stress test. Id. at 663.

A cardiopulmonary exercise stress test was performed on
July 14, 2016. AR at 621. It showed that plaintiff had a normal
exercise capacity with a reduced maximal aerobic capacity. Id.
It also showed a decreased breathing reserve. Id. A mild
obstruction was shown with spirometry testing. Id. The report
concluded that there was "a ventilatory limitation exercise with
possible contribution of obesity to exercise limitation." Id.

Plaintiff saw Dr. Newsome on August 4, 2016, for a routine
follow-up. AR at 660. She reported the same level of shortness
of breath. Id. Her examination was normal, including clear lungs
and breath sounds. Id. at 660.

On October 5, 2016, Plaintiff was evaluated by Dr. Newsome
again for shortness of breath and dyspnea (labored breathing).
At the time, she was also suffering from an upper respiratory
infection. AR at 658. She was reportedly disappointed with the
previous evaluation, believing that her symptoms were more than
a combination of asthma and weight gain because her dyspnea
began when she weighed less. Id. Plaintiff indicated that she
"will have to look for some form of work that will not be as
physically demanding" because of increasing financial and
emotional stress. Id. Plaintiff's lungs and breath sounds were
clear on examination. Id. Dr. Newsome wrote, "this has been a

very frustrating evaluation. There are no significant findings other than the moderate persistent asthma. I disagree with the recommendation of using prednisone." He changed her bronchodilator regimen and encouraged her to look into employment involving case management or patient outreach.  Dr. Newsome observed that "some of her symptoms are unpredictable and might lead to absenteeism." Id. at 659.

On November 21, 2016, Dr. Newsome wrote that Plaintiff was "a thirty-six-year-old registered nurse who has been unable to work due to severe shortness of breath since November 2015." AR at 1130. He asserted that Plaintiff was "unable to resume her employment as a critical care nurse" because "[s]he becomes breathless with long periods of physical exertion including moving patients, walking to and from workstations[,] and other physical activities." Id. at 1131. He saw "no foreseen endpoint when she might be able to return to that level of work duty." Id.

On December 1, 2016, plaintiff saw Dr. Newsome for a routine follow-up. AR at 655. She reported that she was having "her ups and downs" and that there were days when she was able to get out and move about without any significant limitations and days when she was unable to walk more than 20 feet without becoming extremely short of breath. Id. Dr. Newsome noted the plaintiff had been overusing inhalers and was making some

progress in smoking cessation (she had plans to fill the Chantix prescription). Id. On exam, her lungs and breath sounds were clear. Id. The doctor noted, "while she is making some progress, she is still not able to resume working, even in a sedentary job. She still has some days that she is unable to walk short distances. This would be very disruptive to any job." Id. at 656.

On April 10, 2017, plaintiff saw Dr. Newsome for another follow-up. AR at 722. She told him there was some minimal improvement in her exercise tolerance and she was having more days when she could walk without the same degree of exhaustion and breathlessness. Id. She had a new healthcare provider and they were exploring the possibility of an underlying food intolerance as the cause for her medical issues. Id. Her exam was normal. Id. Dr. Newsome wrote, "she continues to be disabled from her primary job function as an ICU RN. She does not have the respiratory reserve for the rigors of the job. She might be able to perform some limited, part-time computer work." Id.

Plaintiff was evaluated by Dr. Alex H. Gifford, M.D., on June 19, 2017 for shortness of breath. AR at 807. She told Dr. Gifford she had recently stopped smoking clove cigarettes (which she had been smoking for a number of years) and complained of severe and progressive exertional dyspnea. Id. She reported to Dr. Gifford that she needed to rest after performing 30 minutes

of light housework because of dyspnea and needed to pace herself
during daily activities to avoid breathlessness. Id. She
recounted her prior medical visits, as well as the fact that she
fired Dr. Farber, after he said that she was short of breath
because of her weight. Id. She also reported having had a
ventilation perfusion scan that was negative for chronic
pulmonary emboli and was told that she did not have pulmonary
arterial hypertension. Id. Plaintiff was described as "[w]ell -
appearing" and her examination was normal. Id. at 810.
Spirometry testing revealed mild obstruction and normal
diffusion. Id. at 811. Dr. Gifford also noted that Plaintiff's
"dyspnea seems to be out of proportion to the severity of the
airflow obstruction alone." Id.

On August 18, 2017, Plaintiff was seen again by Dr.
Gifford, who concluded that there was no evidence of
exacerbation or even poorly controlled symptoms of asthma. AR at
749. On the contrary, the doctor wrote that Plaintiff "has good
symptom control on [her treatments]" and she did not make any
changes to her regimen. Id. She wrote, "[a]lthough it is
possible that chronic airflow obstruction is contributing to her
dyspnea, the extent to which the dyspnea impacts her daily life
seems out of proportion to the severity of the airflow
obstruction by spirometry." Id.

Plaintiff next saw Dr. Gifford on October 10, 2017. AR at
750. New stress testing showed a better breathing reserve, but a
reduced oxygen capacity, and an anaerobic threshold that was
earlier than expected. Id. at 750. Dr. Gifford explained that
the fact that the breathing reserve was improved compared to
last year probably reflects the effects of her treatment, which
included an inhaled corticosteroid and long-acting
bronchodilators. Id.

On November 15, 2017, Plaintiff was evaluated by Julia K.
McCallum, M.D., at Dr. Gifford's request, to assess her work
ability. AR at 751. On exam, Plaintiff was alert, breathing
comfortably, and demonstrated joint hyper flexibility. Id. at
754. Dr. McCallum noted that Plaintiff had an upcoming
neurological consultation with Dr. Stommel to evaluate for
neuromuscular disorder, as well as a referral to
rheumatology/genetics for evaluation for possible Ehlers Danlos
Syndrome. Id. at 755. The report was cosigned by Dr. Karen L.
Huyck, M.D. Id. Dr. Huyck requested a functional capacity
evaluation from Gregory Morneau. Id. at 1012.

On November 20, 2017, Plaintiff was evaluated by Kevin R.
Chysna, M.D., a neurologist, to determine if a neuromuscular
process accounted for her symptoms of exertional dyspnea. AR at
760. Plaintiff reported experiencing symptoms for two years, and
said that it felt like her breathing was getting better over two

years. Id. She said that her weakness was more episodic in
nature, and that, before this happened, she was very physical,
running, working as a nurse, etc. Id. She reported that her
knees and hips seem to be giving out more often, but
denied feeling off balance. Id. The doctor wrote that
plaintiff's other care provider wondered about Ehlers Danlos
Syndrome given her history of Raynaud's and hyper flexible
joints. Id.

Plaintiff's examination was normal, including gait, full
motor strength, and normal neurological testing. AR at 762. Dr.
Chysna concluded that the nerve conduction studies, history, and
exam do not suggest that a neuromuscular process is the cause of
her shortness of breath—instead, he believed her complaints were
"likely a result of her other comorbidities (asthma, chronic
pain) in conjunction with some degree of deconditioning." Id. He
also wrote, "apparently the diagnosis of Ehlers Danlos Syndrome
is being entertained. I doubt this is accounting for her
symptoms. Could consider rheumatology referral for evaluation.
No further workup recommended." Id.

Plaintiff had a rheumatology consultation with Chapparala
Geeta, M.D., in January 2018, at which time she presented
without spinal tenderness, joint synovitis, or fibromyalgia
tender points. AR at 1145. Upon examination, the rheumatologist
ruled out Ehlers Danlos Syndrome and instead diagnosed benign

hypermobility syndrome. Id. at 1146. She further indicated that
the claimant's fatigue was likely not related to her
hypermobility but could be related to her asthma and
deconditioning. Id.

On January 22, 2018, Plaintiff was examined by Kerrington
Smith, M.D. AR at 946. She told Dr. Smith that she was "actually
doing a lot better" and that she wanted "to try to go back to
work in the fall" as a critical care nurse. Id. She said she was
seeing Dr. Chapparala who thought she had Ehlers Danlos but now
thinks she has a benign flexibility. Id. at 946. As for her
asthma, plaintiff indicated that her testing had improved (her
reserve increased from 6% to 26% in eighteen months. Id.

The functional capacity evaluation Dr. Huyck ordered in
November 2017, dated March 15, 2018, was prepared by Gregory
Morneau, O.T. AR at 1012–32. Mr. Morneau wrote, "[a]lthough she
may be able to tolerate 3-4 hours per day of sedentary demand
level work, more standing mobility will limit this length of
time per day that she can work." Id. at 1015. He also noted that
plaintiff reported dizziness and seeing spots during the
evaluation (while stooping and walking on a treadmill incline),
which led him to conclude that "[s]tanding with faster movements
may result in dizziness." Id. at 1016.  Morneau reported that
plaintiff told him that "she may not be dependable to show up
every day" to work. Id. Morneau indicated that Plaintiff can

tolerate part-time, sedentary physical demand level work into
the late range for 3 to 4 hours per day five days per week,
occasionally lifting 28 pounds from the floor, 23 pounds to the
shoulder, and 18 pounds overhead, and carrying 28 pounds 30
feet. Id. at 1016. He estimated that sitting and standing should
be limited to 90 minutes at most of the time, occasionally a
workday. Id.

Based on Mr. Morneau's report, Dr. Huyck opined in April
2018, that plaintiff could not return to work safely because of
"dizziness with exertion and heart rate volatility." AR at 1127.
She explained that plaintiff did not develop dizziness with
sitting, but with standing and faster movements. Id. at 1128).
She also wrote that, "it is unlikely that [plaintiff] would be
dependable to show up every day." Id. Dr. Huyck indicated that
Plaintiff was "medically cleared to do up to 3-4 hours per day
of sedentary demand level work up to three days per week at home
only." Id.

Plaintiff underwent a genetic evaluation in July 2018 with
Mary Beth Dinulos, M.D. AR at 1159. She had normal coordination
and a normal neurological examination; however, she also had a
Beighton scale of hypermobility score of 6/9, which was
confirmation of joint hypermobility. Id. at 1161. Dr. Dinulos
noted that Plaintiff's history and physical examination was
inconsistent with other connective tissue disorders, and her

symptoms were not consistent with classical, vascular, or more rare subtypes of EDS. Id. She ultimately diagnosed hypermobile EDS based on recently revised diagnostic criteria crafted in 2017, which primarily considers subjective complaints; she further noted that hypermobile EDS is not diagnosed through genetic testing. Id. at 1161–62.

## C. The decision under review

The ALJ assessed Ms. Libby's claim under the five-step, sequential analysis required by 20 C.F.R. § 404.1520. At step one, he found that Ms. Libby had not engaged in substantial gainful activity since her alleged disability onset date of November 9, 2015. AR at 18. At step two, the ALJ found that Ms. Libby's asthma qualified as a severe impairment. Id. at 18–19. At step three, the ALJ determined that, prior to June 2016, none of Ms. Libby's impairments, considered individually or in combination, qualified for any listed impairment. Id. at 765. The ALJ then found that Ms. Libby had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 404.1567(b), with the following exceptions:

> she can stand and walk for 4 hours in an 8-hour workday; she can sit for 8 hours in an 8-hour workday; she can occasionally bend, stoop, and crawl; she should not climb ladders, ropes, or scaffolds; she should not be exposed to unprotected heights; and she avoid concentrated exposure to respiratory irritants.

Id. at 23.

The ALJ found that, even limited in this manner, Ms. Libby
would be able to perform her past work as a hospital admitting
clerk. Id. at 30. In the alternative, the ALJ found that she
could perform other jobs that exist in the national economy,
such as medical records clerk or medical billing clerk. Id. at
31. The ALJ accordingly found that Ms. Libby was not disabled
within the meaning of the Social Security Act during the
relevant time period. Id. at 32; 20 C.F.R. §§ 404.1520(f).

### III.  DISCUSSION

Although her motion is not entirely clear, Libby appears to
challenge the ALJ's decision based on the following alleged
errors:  1) discounting Dr. Newsome's opinion that she was
incapable of working; 2) discounting Dr. Huyck's opinion that
she was limited to sedentary work; 3) finding that SEID was not
a severe impairment; 4) declining to find that her conditions
warranted a musculoskeletal listing; and 5) reliance on Dr.
Haynes's expert medical testimony.  The court addresses each
claimed error in turn.

### A.  Dr. Newsome's Opinion

Plaintiff's first challenge is to the ALJ's evaluation of
the opinions provided by her treating pulmonologist, Dr. Glenn
Newsome, M.D. Pltf. Mot. (Doc. No. 15) at 5. The ALJ assigned
little weight to Dr. Newsome's opinion that plaintiff could not

work.  Dr. Newsome treated Plaintiff from December 2015 through April 2017. AR at 668, 72.  The court finds no error.

Dr. Newsome provided one formal opinion in November 2016, and commented on Plaintiff's work capacity in two treatment notes.  First, in November 2016, Dr. Newsome wrote that plaintiff has been "unable to work due to severe shortness of breath since 2015" and that, "in summary, [she] has been unable to resume her employment as a critical care nurse" because "she becomes breathless with long periods of physical exertion including moving patients, walking to and from workstations[,] and other physical activities." AR at 1130–31. He concluded, "there is no foreseeable endpoint when she might be able to return to that level of work duty." AR at 1131.

Next, in a December 2016 treatment record, Dr. Newsome commented that "while [plaintiff] is making some progress, she is still not able to resume working, even in a sedentary job. She still has some days that she is unable to walk short distances. This would be very disruptive to any job." AR at 656.

Finally, in an April 2017 treatment note, Dr. Newsome wrote that plaintiff "continues to be disabled from her primary job function as an ICU [nurse]. She does not have the respiratory reserve for the rigors of the job. She might be able to perform some limited, part-time computer work." AR at 722.

The ALJ agreed that plaintiff's "limitation to a range of light exertional work does, indeed, preclude her past relevant work as a nurse," but he gave little weight to "Dr. Newsome's overall opinion, . . . as he did not functionally assess her limitations but rather merely stated that she could not return to her former employment." AR at 28.

The opinion of a treating source such as Dr. Newsome is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2). "If, however, the treating-source opinion conflicts with other opinions in the record, the ALJ 'may reject the opinion of the treating physician so long as an explanation is provided and the contrary finding is supported by substantial evidence.'" Wilson v. Saul, No. 19-cv-511-LM, 2020 WL 1969538 at *4 (D.N.H. April 24, 2020) (quoting Tetreault v. Astrue, 865 F. Supp. 2d 116, 125 (D. Mass. 2012) (internal quotation marks, citation omitted)). Also, as particularly relevant here, opinions that a claimant is unable to work — regardless of the source — are never entitled to any particular significance (including controlling weight) because that issue is reserved to the Commissioner. 20 C.F.R. § 404.1527(d); Ledoux v. Acting

Comm'r, Soc. Sec. Admin., No. 17-cv-707-JD, 2018 WL 2932732, at *5 (D.N.H. June 12, 2018).

In addition to rejecting Dr. Newsome's opinion that plaintiff was unable to work as an issue reserved to the Commissioner, AR at 28, the ALJ also found that Dr. Newsome's opinions were not well-supported. "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). The ALJ explained that Dr. Newsome's clinical findings on April 10, 2017 — the same date he wrote that Plaintiff "continues to be disabled from her primary job function as an ICU [nurse]"— were normal. AR at 28 (citing AR at 722. Indeed, all of Dr. Newsome's examinations yielded normal objective results. AR at 583, 655, 658, 660, 662, 664, 667, 669, 722, 810, 840, 848.

The ALJ also gave Dr. Newsome's opinions less than controlling weight because they were "inconsistent with pulmonary function testing and clinical examinations since November 2015, which reflect an improvement in [Plaintiff's] respiratory status with treatment." AR at 28 (citing AR at 621, 648, 786–804. See 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). For

example, while pulmonary function testing in May 2016 revealed a moderate obstructive lung defect (but "a good response to [a] bronchodilator") AR at 648–49, testing in June 2017 showed only a mild obstruction, prompting the examining pulmonologist to remark that plaintiff's shortness of breath "seems to be out of proportion to the severity of the airflow obstruction alone." Id. at 810–11. Similarly, a July 2016 cardiopulmonary stress test showed a breathing reserve of 6% (normal is 20-40%) id. at 621), while an October 2017 stress test revealed a normal breathing reserve (28%), as well as normal lung capacity, and only mildly reduced residual functional capacity. AR at 925. Dr. Gifford explained that "[t]he fact that the breathing reserve is improved compared to last year probably reflects the effects of her [treatment]." AR at 750. Plaintiff's remaining testing was normal. See AR at 568 (March 2016 pulmonary artery catheterization revealed no evidence of pulmonary hypertension), 652 (May 2016 pulmonary nuclear scans "negative for significant pulmonary perfusion"), 653 (Nov. 2015 chest x-ray showed "[n]o acute cardiopulmonary process"), 810 (Feb. 2017 stress echocardiogram showed no evidence of diastolic cardiac dysfunction during exercise—exercise tolerance described as "fair")).

Finally, the ALJ noted that plaintiff's self-reported physical activities were inconsistent with disabling breathing

limitations. AR at 26–27). See 20 C.F.R. § 404.1527(c)(4)
(describing consistency factor). For example, in June 2017,
plaintiff reported that quitting smoking had improved her
breathing and that she had hosted the graduation party for her
son and performed some yard work. AR at 26 (citing AR at 691).
The next month, she was reportedly going to the gym 3–4 days per
week. AR at 26 (citing AR at 946). She continued to report going
to the gym or exercising with cardiovascular equipment and
weight lifting about 3–5 times per week through the beginning of
2019, stopping only because of a pelvic fracture. AR at 26
(citing AR at 1068, 1086, 1089, 1120, 1139, 1148, 1155, 1209,
1285, 1307). Additionally, plaintiff reported that in March 2018
she was having little to no difficulty with housework, hobbies,
lifting groceries from the floor, performing light activities,
walking a mile, going up or down stairs, sitting for an hour, or
running on even ground. AR at 26 (citing AR at 1141). And
although she reported ongoing fatigue, her treating providers
noted that this was out of proportion to her spirometry
findings. AR at 26–27 (citing AR at 749, 811).

    Against this factual backdrop, the court finds that the
"record as a whole, . . . [is] adequate to the support" the
ALJ's consideration of Dr. Newsome's opinions.

B.  Dr. Huyck's opinion

As previously noted, Dr. Huyck provided an opinion in April 2018 that limited plaintiff to part-time, sedentary work. This opinion was based on a functional capacity evaluation performed by Gregory Morneau, O.T. Dr. Huyck concluded that plaintiff could not return to work safely because of "dizziness with exertion and heart rate volatility." AR at 1127. She explained that plaintiff did not develop dizziness with sitting, but with standing and faster movements. AR at 1128. She also wrote that, "it is unlikely that [plaintiff] would be dependable to show up every day." Id. Dr. Huyck indicated that plaintiff was "medically cleared to do up to 3-4 hours per day of sedentary demand level work up to three days per week at home only." Id.

The ALJ gave little weight to Mr. Morneau's report, upon which Dr. Huyck's conclusion was based, in part because of inconsistencies between what plaintiff reported to Dr. Huyck and other reports in the record. AR at 28) (citing AR at 1014). See 20 C.F.R. § 404.1527(c)(4) (describing consistency factor). For example, plaintiff underestimated her ability to stand and overrated her level of disability. AR at 28. Additionally, the ALJ noted that plaintiff did not complete the treadmill test (reporting significant dizziness), but separately reported that she could walk up to two miles. Id. (citing AR at 1015, 1018).

The ALJ also pointed out that plaintiff's inability to walk on a treadmill for an extended period was inconsistent with her exercise stress tests, which showed [fair] to excellent exercise tolerance." AR at 29 (citing AR at 892–93, 924–25, 1175). The ALJ also observed that Mr. Morneau's proposed work limitations were inconsistent with plaintiff's own report of having no limitations sitting and the ability to lift and carry 30 pounds. AR at 29 (citing AR at 1018). Additionally, the ALJ noted that Mr. Morneau's evaluation is "inconsistent with [plaintiff's] previous and subsequent reports of going to the gym 3-5 times per week, remaining functional during the day so long as she received 8-9 hours of sleep per night, and doing almost everything around the house." AR at 29) (citing AR at 946, 1068, 1086, 1088, 1089, 1120, 1139, 1148, 1155, 1209, 1285, 1307). Finally, the ALJ noted that Mr. Morneau's restriction to part-time work was inconsistent with the opinions provided by two consulting medical experts who reviewed the report: Dr. John Pella, M.D., a pulmonologist, and Dr. James Haynes, M.D., a neurologist. AR at 28–29, 56, 120).

The ALJ also gave less weight to the Morneau report because, "he did not offer an adequate explanation as to why he limited [Plaintiff] to part-time work in light of [Plaintiff's] own reports of an unlimited sitting tolerance." AR at 29, 1018). See 20 C.F.R. § 404.1527(c)(4) ("The better an

explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Relatedly, the ALJ found that Mr. Morneau's opinion that Plaintiff could only work at a sedentary job for 3 to 4 hours in a day was not supported by his own clinical findings, which showed that Plaintiff was capable of occasionally lifting and carrying 28 pounds and lifting up to 23 pounds overhead, standing for one hour and 28 minutes consecutively, and sitting for 1 hour and 36 minutes consecutively during the 4 hour and 17 minute test. AR at 29 (citing AR at 1015). See 20 C.F.R. § 404.1527(c)(3) (describing supportability factor).

The ALJ gave little weight to Dr. Huyck's April 2018 opinion for similar reasons. AR at 29-30, 1127-29. He explained, for example, that Dr. Huyck's opinion that plaintiff was precluded from work due to dizziness with exertion and heart rate volatility was inconsistent with plaintiff's cardiology workup, which revealed excellent exercise tolerance and no evidence of dizziness. AR at 29 (citing AR at 1175-76, 1418). See 20 C.F.R. § 404.1527(c)(4) (describing consistency factor). Additionally, the ALJ observed that Dr. Huyck opined — without explanation — that plaintiff's ability to perform sedentary work would be limited by her "reports of dizziness with standing and faster movements." AR at 29, 1128). The ALJ also noted that Dr. Huyck did not explain why she believed it

was unlikely that Plaintiff would be dependable to show up every day. AR at 29, 1128. See 20 C.F.R. § 404.1527(c)(4) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). As for Dr. Huyck's opinion that Plaintiff could work 3 to 4 hours per day at the sedentary level for 3 days per week (at home only), the ALJ noted that these restrictions are inconsistent with Plaintiff's own reports of no limitation with sitting, an ability to lift up to 30 pounds, and her ability to go to the gym several days per week. AR at 29 (citing AR at 946, 1018, 1068, 1086, 1088, 1089, 1120, 1139, 1148, 1155, 1209, 1285, 1307).

The ALJ's consideration of the opinions of Dr. Huyck and Mr. Morneau "offer a rationale that could be accepted by a reasonable mind," Levesque, 2019 WL 2004298, at *4, and are "specific . . . and supportable," Dimambro, 2018 WL 301090, at *10. The court therefore finds no reversible error in the ALJ's consideration of their opinions.

C.  SEID is Not a Severe Impairment

At the second step of the sequential evaluation analysis, the ALJ must determine whether the claimant's impairment or combination of impairments is severe, meaning that the impairments significantly limit the claimant's physical or mental ability to do basic work activities. See 20 C.F.R. §

404.1520(c); see also 20 C.F.R. § 404.1521 (defining non-severe
impairments). The claimant has the burden of proving that a
medically determinable impairment is severe. Ramos v. Barnhart,
60 F. App'x 334, 335 (1st Cir. 2003) (quoting Bowen v. Yuckert,
482 U.S. 137, 146, n. 5 (1987)). An impairment is not severe
only where "medical evidence establishes only a slight
abnormality or combination of slight abnormalities which would
have no more than a minimal effect on an individual's ability
to work even if the individual's age, education, or work
experience were specifically considered." Barrientos v. Sec'y
of Health & Human Servs., 820 F.2d 1, 2 (1st Cir.1987) (per
curiam) (citations and internal quotation marks omitted).

Plaintiff asserts that that the ALJ erred by wrongly
concluding that her Systemic Exertion Intolerance Disease was
"not a medically determinable impairment but rather a symptom."
Pltf. Mot. (Doc. No. 15) at 6; AR at 19). A full and fair
reading of the ALJ's decision, however, reveals that the ALJ
did not so conclude.  To the contrary, while the ALJ did find
SEID to be a medically determinable impairment, he also found
that it was not severe. AR at 21.  The ALJ explained that
plaintiff's reported fatigue, in of itself, was not a medically
determinable impairment but a symptom that he had considered in
connection with her diagnosed conditions — specifically, EDS
and SEID. AR at 19–21. Ultimately, the ALJ found that SEID was

a medically determinable impairment, but concluded that it wasn't severe because it imposed no more than minimal limitations in plaintiff's ability to perform basic work activities. AR at 21.

The court is persuaded that the ALJ's finding that SEID was not a severe impairment is supported by substantial evidence.  First, as the ALJ explained, plaintiff's reports of excessive fatigue were inconsistent with the fact that, "her treating providers have not observed her to appear overly tired or fatigued during clinical examinations." AR at 21. Next, the ALJ noted that neither a sleep study nor cardiology testing revealed any causes of fatigue. AR at 21, 1086–88, 1416–18. Next, the ALJ considered that plaintiff's reports indicated she was functional during the day without naps, so long as she sleeps at least 8 to 9 hours per night. AR at 21, 1086, 1088. Finally, the ALJ observed that during a period where plaintiff did suffer increased fatigue, it was later discovered that Plaintiff was actually suffering from mononucleosis, which eventually resolved. AR at 21, 1345, 1347, 1432–33, 1442). Accordingly, the court finds no error with respect to the ALJ's analysis of plaintiff's SEID diagnosis.

D.  Musculoskeletal Rating

Next, Plaintiff alleges that an expert in musculoskeletal disorders should have been requested to determine whether any of her conditions satisfied a musculoskeletal listing. Pltf. Mot. (Doc. No. 15) at 6-7.  The plaintiff bears the burden of proving, at step three, that she meets or equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. See Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  An ALJ is not required to obtain medical expert advice on whether impairment equals a listing if the ALJ "believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment." Byron v. Saul, No. 18-cv-684-PB, 2019 WL 3817401, at *4 (D.N.H. Aug. 14, 2019).  The court finds that plaintiff has failed to meet her burden.

Plaintiff devotes only one paragraph to this issue Pltf. Mot. (Doc. No. 15) ¶ 5.  While that is not dispositive, her vague and conclusory reference to "extensive records of severe musculoskeletal impairments" is insufficient to overturn the ALJ's decision.  Contrary to plaintiff's claim of "limit[ed] ability to ambulate significantly," id., various medical records indicate that plaintiff's gait was normal, see AR at 628, 672, 686, 735, 762, 1120, 1221, including after her recovery from a pelvic fracture in 2019. AR at 1313, 1318.

Accordingly, the court finds no error in the ALJ's decision not to call an expert in musculoskeletal disorders.

E.  Dr. Haynes's Expert Testimony

Plaintiff's final argument relates to her diagnosis of hypermobility EDS. Plaintiff contends that the ALJ erred by relying on testimony from Dr. Haynes to find that EDS is not a medically determinable impairment. Pltf. Mot. (Doc. No. 15) at 7–8.  The court finds no error. Although Dr. Mary Beth Dinulos, M.D., diagnosed hypermobility EDS, AR at 1161, the ALJ gave greater weight to the competing diagnosis of benign joint hypermobility syndrome made by Chapparala Geeta, M.D., and Dr. Haynes. AR at 19–21, 1146.

Substantial evidence supports the ALJ's conclusion.  The ALJ undertook a lengthy and detailed explanation of the competing diagnoses, AR at 19-21, pointing out how various record findings contradicted Dr. Dinulos's conclusions, and ultimately finding that plaintiff's symptoms did not cause more than minimal limitations in the workplace. AR at 21.  This is a classic case of the ALJ carrying out his responsibility to resolve conflicts among medical opinions and draw reasonable inferences from the record.  See Pires v. Astrue, 553 F. Supp. 2d 15, 21 (D. Mass. 2008)  (noting that "resolution of conflicts in the evidence or questions of credibility is

outside the court's purview, and thus where the record supports more than one outcome, the ALJ's view prevails").

## IV. CONCLUSION

Because the ALJ has not committed a reversible error in evaluating Ms. Libby's claim, her motion for an order reversing the Acting Commissioner's decision, Doc. No. 15, should be denied; the Acting Commissioner's motion for an order affirming her decision, Doc. No. 16, should be granted; and the clerk of the court should be directed to enter judgment in accordance with this order and close the case.

Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). The 14-day period may be extended upon motion. Failure to file a specific written objection to the Report and Recommendation within the specified time waives the right to appeal the district court's order. See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016); Fed. R. Civ. P. 72(b)(2).

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

January 18, 2022

cc:  Erine Libby, pro se
     Counsel of Record